1  HEDIN HALL LLP
   Frank S. Hedin (SBN 291289)
2  fhedin@hedinhall.com
   Four Embarcadero Center, Suite 1400
3  San Francisco, California 94104
   Telephone:   (415) 766-3534
4  Facsimile:   (415) 402-0058

5  AHDOOT & WOLFSON, PC
   Robert Ahdoot (SBN 172098)
6  rahdoot@ahdootwolfson.com
   10728 Lindbrook Drive
7  Los Angeles, California 90024
   Telephone:   (310) 474-9111
8  Facsimile:   (310) 474-8585

9  BURSOR & FISHER, P.A.
   L. Timothy Fisher (SBN 191626)
10 ltfisher@bursor.com
   1990 North California Blvd., 940
11 Walnut Creek, California 94596
   Telephone:   (925) 300-4455
12 Facsimile:   (925) 407-2700

13 [Additional counsel on signature page]

14 *Counsel for Plaintiffs and the Putative Classes*

15            **UNITED STATES DISTRICT COURT**

16          **NORTHERN DISTRICT OF CALIFORNIA**

17

18 LEIGH   WHEATON;   JILL   PAUL;   and      Case No. _____
   TREVOR PAUL, individually and on behalf
19 of all others similarly situated,

20          Plaintiffs,                        CLASS ACTION

21 v.                                          **CLASS ACTION COMPLAINT**

22 APPLE INC.,

23          Defendant.

24

---

On behalf of themselves and all others similarly situated, Plaintiffs Leigh Wheaton, Jill Paul, and Trevor Paul complain and allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters, and demand trial by jury. Plaintiffs believe that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      In early 2019, in an effort to capitalize on recent revelations concerning the data-sharing practices of its competitors Facebook, Inc. and Google LLC, Apple Inc. ("Apple") placed a massive billboard in Las Vegas, Nevada touting its supposedly pro-consumer positions on issues of data privacy:



2.      The statement on the billboard is plainly untrue, however, because – as will be explained in detail below – none of the information pertaining to the music you purchase on your iPhone stays on your iPhone.

CLASS ACTION COMPLAINT

3.    To supplement its revenues and enhance the formidability of its brand in the eyes of mobile application developers, Apple sells, rents, transmits, and/or otherwise discloses, to various third parties, information reflecting the music that its customers purchase from the iTunes Store application that comes pre-installed on their iPhones.  The data Apple discloses includes the full names and home addresses of its customers, together with the genres and, in some cases, the specific titles of the digitally-recorded music that its customers have purchased via the iTunes Store and then stored in their devices' Apple Music libraries (collectively "Personal Listening Information").  After Apple discloses its customers' Personal Listening Information, the various third-party recipients of this data then append to it a myriad of other categories of personal information pertaining to Apple's customers – such as gender, age, household income, educational background, and marital status – only to then re-sell that Personal Listening Information (enhanced with various categories of demographic data) to other third parties on the open market.

4.    Rhode Island resident Leigh Wheaton brings this action for legal and equitable remedies to redress and put a stop to the illegal actions of Apple in disclosing to third parties her Personal Listening Information and that of all other similarly-situated Rhode Island residents who purchased music from Apple on its iTunes Store platform, in violation of Rhode Island's Video, Audio and Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32 (the "RIVRPA").

5.    Additionally, Michigan residents Jill Paul and Trevor Paul, individually and on behalf of all others similarly situated, bring this action for legal remedies to redress the illegal actions of Apple in disclosing to third parties, between May 24, 2016

and July 30, 2016, their Personal Listening Information and that of all other similarly-situated Michigan residents who purchased music from Apple on its iTunes Store platform, in violation of Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "MIPPPA").[1]

6.     As set forth below, Apple has sold, rented, transmitted, and/or otherwise disclosed the Personal Listening Information of the Plaintiffs and millions of its other customers to developers of various mobile applications available for download in its App Store, as well as to data aggregators, data appenders, data cooperatives, list brokers, and other third parties, many of whom have in turn re-disclosed Plaintiffs' and the other unnamed class members' Personal Listening Information to other third parties for further exploitation and monetization – all without providing prior notice to or obtaining the requisite consent from anyone.  Such disclosures invaded Plaintiffs' and the unnamed Class members' privacy and have resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.

7.     The Rhode Island RIVRPA and the Michigan MIPPPA clearly prohibit what Apple has done. Subsection (a) of Rhode Island's RIVRPA provides:

---

[1]     In May 2016, the Michigan legislature amended the MIPPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the MIPPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [MIPP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the MIPPPA, the unamended version of the MIPPPA applies in this case.  *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

CLASS ACTION COMPLAINT

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records <u>which would identify the names and addresses of individuals, with the titles or nature of</u> video films, <u>records, cassettes, or the like, which they purchased,</u> leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops <u>or any retailer or distributor of those products</u>, whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

RIVRPA § (a) (emphasis added). Similarly, section 2 of the MIPPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, <u>sound recordings</u>, or video recordings shall not disclose to any person, other than the customer, <u>a record or information concerning the purchase</u>, lease, rental, or borrowing <u>of those materials by a customer that indicates the identity of the customer</u>.

MIPPPA § 2 (emphasis added).

8.    Thus, while Apple profits handsomely from its unauthorized sale, rental, transmission, and/or disclosure of its customers' Personal Listening Information, it does so at the expense of its customers' privacy and statutory rights because Apple does not notify let alone obtain the requisite written consent from its customers prior to disclosing their Personal Listening Information.

9.    Apple's disclosures of the Personal Listening Information of Plaintiffs and the other unnamed Class members were not only unlawful, they were also dangerous because such disclosures allow for the targeting of particularly vulnerable members of society.  For example, any person or entity could rent a list with the names and addresses of all unmarried, college-educated women over the age of 70 with a household income of over $80,000 who purchased country music from Apple via its iTunes Store mobile application. Such a list is available for sale for approximately $136 per thousand customers listed.

1    10.    On behalf of themselves and the putative Classes defined below, Plaintiffs

2    bring this Complaint against Apple for intentionally and unlawfully disclosing their

3    Personal Listening Information, *en masse*, in violation of the RIVRPA and the

4    MIPPPA, as well as for unjust enrichment.

5                          **JURISDICTION AND VENUE**

6    11.    The Court has subject-matter jurisdiction over this action pursuant to 28

7    U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount

8    in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least

9    one member of each of the classes is a citizen of a state different from Apple.

10    12.    Personal jurisdiction and venue are proper because Apple maintains its

11    corporate headquarters in Cupertino, California and within this district.

12                              **PARTIES**

13    13.    Plaintiff Wheaton is, and at all times alleged herein was, a natural person

14    and citizen of the State of Rhode Island. Plaintiff Wheaton is an avid music listener

15    who has regularly purchased digital music, including rock music, from Apple via

16    Apple's iTunes Store, using her iPhone.

17    14.    Plaintiff Jill Paul is, and at all times alleged herein was, a natural person

18    and citizen of the State of Michigan. Plaintiff Paul is an avid music listener who has

19    regularly purchased digital music, including rock music, from Apple via Apple's

20    iTunes Store, using her iPhone.

21    15.    Plaintiff Trevor Paul is, and at all times alleged herein was, a natural

22    person and citizen of the State of Michigan. Plaintiff Paul is an avid music listener who

23

24

CLASS ACTION COMPLAINT

has regularly purchased digital music, including rock music, from Apple via Apple's iTunes Store, using his iPhone.

16.     Defendant Apple Inc. is a Delaware corporation with its principal place of business in Cupertino, California. Apple does business throughout California and across the United States.  Apple is a retailer and distributor of digital music, which it sells to consumers online via its iTunes Store mobile application.

## APPLICABLE STATUTORY SCHEMES

17.     In 1988, leading up to the enactment of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

18.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the VPPA), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).   The personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our

whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

19.     Following the VPPA's enactment, several states, including Rhode Island and Michigan, quickly followed suit.

## I.     Rhode Island's Video, Audio, And Publication Rentals Privacy Act

20.     Recognizing the need to further protect its citizens' privacy rights, Rhode Island's legislature enacted the RIVRPA to "prohibit[] the revealing of records relating to the rental of video or audio tapes or publications." Explanation By The Legislate Council, attached as **Exhibit A**.

21.     Subsection (a) of the RIVRPA states:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of video films, records, cassettes, or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products, whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

RIVRPA § (a) (emphasis added).

22.     Despite the fact that tens of thousands of Rhode Island residents have purchased music from Apple via its iTunes Store platform, Apple has disregarded its legal responsibilities to these individuals by systematically disclosing their Personal Listening Information in violation of the RIVRPA.

## II.     Michigan's Personal Privacy Preservation Act

23.     Also recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the MIPPPA "to preserve personal privacy with respect

7

to the purchase, rental, or borrowing of certain [audiovisual and reading] materials," by prohibiting companies from disclosing certain types of sensitive consumer information pertaining thereto.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

24.    Subsection 2 of the MIPPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, <u>sound recordings,</u> or video recordings shall not disclose to any person, other than the customer, <u>a record or information concerning the purchase,</u> lease, rental, or borrowing <u>of those materials by a customer that indicates the identity of the customer.</u>

MIPPPA § 2 (emphasis added).

25.    Michigan's passage of the MIPPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

26.    Despite the fact that hundreds of thousands of Michigan residents have purchased music from Apple via its iTunes Store platform, Apple has disregarded its legal responsibilities to these individuals by systematically disclosing their Personal Listening Information in violation of the MIPPPA.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

27.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything

8

we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

28.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

29.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[4]

30.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

---

[2]    FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[3]    *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 13, 2019).

[4]    Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[5]    *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited May 13, 2019).

9

31.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

32.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

33.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

---

[6]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 13, 2019).

[7]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[8]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

34.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Apple share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

35.     Disclosures like Apple's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11] The FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

---

[9]     *See      Prize      Scams*, Federal      Trade      Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 13, 2019).

[10]     C. Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times (May 20, 2007), *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited May 13, 2019).

[11]     *Id.*

[12]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

36.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Apple's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

37.     Apple is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

38.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

## II.     Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

39.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

40.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14] As a result, 81 percent of

---

[13]     *Id.*

[14]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 13, 2019).

CLASS ACTION COMPLAINT

smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

41.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

42.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

43.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

---

[15]     *Id.*

[16]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 13, 2019).

[17]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 13, 2019).

44.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### III.   Apple Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Its Customers' Personal Listening Information

45.     Apple maintains a vast digital database comprised of all of its customers' Personal Listening Information, including information reflecting the genres and titles of all digital music sold to its customers via its iTunes Store platform.[19]

46.     During the time period relevant to this action, Apple has monetized this data in at least two primary ways: (1) by selling, renting, transmitting and/or otherwise disclosing lists comprised of its customers' Personal Listening Information and other highly-personalized demographic information to various third parties; and (2) transmitting and disclosing its customers' full iTunes libraries, comprised of such detailed Personal Listening Information as the specific titles of the songs and albums

---

[18]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 13, 2019) ("It is obvious that people value online privacy.").

[19]     *See also* Titlow, John Paul, *iTunes Radio: Smart for Apple, "Meh" for Users, And Harmless for Pandora*, Sept. 18, 2013, *available at* https://www.fastcompany.com/3017612/itunes-radio-smart-for-apple-meh-for-users-and-harmless-for-pandora (last visited May 13, 2019) (reporting that Apple was using various music-purchasing and listening applications to "collect[] new data points in the form of users tapping those thumb buttons, not to mention skipping, or most tellingly of all, purchasing songs and albums. Over time, these insights will strengthen Apple's music recommendation engine, which is presumably already privy to the day-to-day listening habits of hundreds of millions of users.") (emphasis added).

that its customers have purchased, to various iOS mobile application developers, who in turn have further disclosed this detailed Personal Listening Information to data brokers, data miners, mobile application developers, marketers, and other third parties.

### A. Apple Sells Mailing Lists Comprised of its Customers' Personal Listening Information to Anyone Willing to Pay

47.    First, Apple discloses its customers' Personal Listening Information, identifying the names and addresses of its customers and the particular genres of music they have purchased from its iTunes Store, to data aggregators, data miners, data brokers, data appenders, and other third parties, who then supplement that information with additional sensitive personal information about each of Apple customers, including their age, gender, purchasing habits, education, household income, and (when applicable) the number, age, and gender of the subscriber's children.

48.    These factual allegations are corroborated by publicly-available evidence. For instance, as shown in the screenshot below, the Personal Listening Information of 18,188,721 "iTunes and Pandora Music Purchasers," residing across the United States (including in Michigan and Rhode Island), is offered for sale on the website of Carney Direct Marketing ("CDM") – one of many traffickers of this type of Personal Listening Information – at a base price of "$80/M [per thousand records]" (8 cents each):

| SEGMENTS | | PRICE | ID NUMBER | |
|---|---|---|---|---|
| 18,188,721 | TOTAL UNIVERSE / BASE RATE | $80.00/M | NextMark | 385690 |
| | 1 Month Hotline | + $12.00/M | Manager | |
| | 3 Month Hotline | + $8.00/M | **UNIVERSE** | |
| | | | 18,188,721 | |
| | | | LIST TYPE | |
| **DESCRIPTION** | | | Consumer | |
| iTunes and Pandora music Purchasers are consumers using major | | | | |
| internet providers for their music listening pleasure. iTunes and | | | SOURCE | |
| Pandora Music Purchasers enjoy playing their favorite radio | | | LIST MAINTENANCE | |
| stations from home, work, or mobile devises. Individual song, | | | Counts through | 04/01/2019 |
| video and record purchases and/or commercial free listening allow | | | Last update | 04/01/2019 |
| for a highly custom playlist along with a much wider geographical | | | Next update | 05/01/2019 |
| reach then local radio stations for a higher quality transmitted | | | SELECTS | |
| sound. These purchasers get access to more stations and a wider | | | AGE | 10.00/M |
| variety of programming options all hand selected by the | | | Buying Behavior | |
| individual. | | | Demographic | |
| | | | Education | 8.00/M |
| | | | Full Lifestyle | |
| iTunes and Pandora Music Purchasers are constantly looking for | | | GENDER | 10.00/M |
| the most up to date cutting edge technology. They are highly | | | Geography | 8.00/M |
| response to new technology, cell phones and apps, computers, | | | House Hold Income | 10.00/M |
| vacation packages, coupons, deal saving offers, trial run offers, | | | Interest | |
| entertainment, satellite TV and sports offers. | | | Mail Order Buyer | 10.00/M |
| | | | MARITAL STATUS | 10.00/M |
| | | | PRESENCE OF CHILDREN | 10.00/M |
| | | | GEOGRAPHY | |
| | | | USA | |

*See* **Exhibit C** hereto.

49.     The "iTunes and Pandora Music Purchasers" list offered for sale by CDM contains the Personal Listening Information of tens of thousands of Rhode Island residents and hundreds of thousands of Michigan residents who have purchased music from Apple's iTunes Store.  The "iTunes and Pandora Music Purchasers" list includes, for each Rhode Island and Michigan purchaser of music appearing on the list, the person's name and address, "age," "house hold income," "education," "gender," "geography," "presence of children" and, significantly, "buying behavior," which identifies the particular genre(s) of music that the person purchased from Apple.

16

**CLASS ACTION COMPLAINT**

50.     SRDS, another list brokerage company, offers for sale the same or a similar list as the one sold by CDM, at the same price, and additionally offers a finder's fee to brokers who are able to find purchasers of this Personal Listening Information (offering "20% commission to brokers" and "15% commission to agencies"), as shown in the screenshot below of a publicly-accessible webpage on SRDS's website:



*See* **Exhibit D** hereto.

**B. Apple Discloses its Customers' Personal Listening Information to Various Third-Party Mobile Application Developers, Who in Turn Redisclose Such Information to Other Third Parties**

51.     Additionally, Apple has disclosed and continues to disclose its customers' Personal Listening Information to developers of iOS mobile applications, who in turn have disclosed and continue to disclose such data to other third parties for profit.

17
CLASS ACTION COMPLAINT

52.     During the relevant time period, Apple has intentionally transmitted, either directly or through an intermediary or intermediaries, its customers' Personal Listening Information to the developers of mobile applications programmed with Apple's iOS SDK, without first obtaining the requisite consent of its customers.

53.     Specifically, many mobile applications developed using Apple's iOS SDK have been programmed to provide their developers with complete and total access, via Apple's "MediaPlayer Framework API," to highly-detailed metadata reflecting the full content of the iTunes music libraries of users of devices on which such applications are installed (applications which, on information and belief, include but are not limited to those developed by Pandora).

54.     Thus, Apple's MediaPlayer Framework API, used in conjunction with the iOS SDK, has enabled application developers to collect, via transmissions made by Apple, metadata reflecting the specific titles of the music purchased by particular users of the iOS-equipped devices on which applications utilizing this functionality are installed.  During the relevant time period, developers have accomplished this with as little as a single line of code written into their mobile applications. For example, using the MPMediaQuery.songsQuery() function of the MediaPlayer Framework API, developers are able to grant themselves access to metadata that identifies the titles of all of the songs that a particular user of their application has purchased on iTunes.[20]

---

[20]     *See* Dodson, Ben, *Your Music Library is a Security and Privacy Risk on iOS*, Jan. 13, 2016, *available at* https://bendodson.com/weblog/2016/02/23/details-on-ios-9-3-media-library-additions/ (last accessed May 13, 2019) (a copy of which is attached hereto as **Exhibit E**); Open Radar: Community Bug Reports, *No permission required to access full music library metadata*, Jan. 13, 2016, *available at* https://openradar.appspot.com/radar?id=6078139771912192 (last accessed May 9, 2019) (a copy of which is attached hereto as **Exhibit F**).

55.     Further, during the relevant time period the MediaPlayer Framework API has enabled developers to "create arbitrarily complex queries" with "database access classes from from [the] API," in order to collect users' metadata filtered by specific categories of purchased music. For example, Apple's MediaPlayer Framework API permits developers to retrieve the titles of specific "collections" (i.e., album names) of music that users of their applications have purchased, as well as the "tracks" (i.e., songs) comprising such albums, as illustrated in the graphic below:



*See* Apple Inc., *iPod Library Access Programming Guide*, *available at* https://developer.apple.com/library/archive/documentation/Audio/Conceptual/iPodLibraryAccess_Guide/AboutiPodLibraryAccess/AboutiPodLibraryAccess.html#//apple_ref/doc/uid/TP40008765-CH103-SW16 (last accessed May 14, 2019) (section titled "About Collections and Playlists"), a copy of which is attached hereto as **Exhibit G**.

56.     As another example, Apple's MediaPlayer Framework API has enabled application developers to collect from their users' iTunes music libraries metadata that

19
CLASS ACTION COMPLAINT

identifies the titles of particular artists' albums that the applications' users have purchased from Apple, as illustrated in the graphic below:



*See* Ex. G (section titled "Getting Media Items Programmatically").

57.     The metadata disclosed by Apple to these mobile application developers, by way of its proprietary MediaPlayer Framework API and/or similar such functionality, not only identifies the specific titles and/or the nature of the digitally-recorded music purchased by Apple's customers, but also is linked to data that identifies the individuals who purchased the music reflected in the metadata and/or the specific devices these individuals used to make such purchases, including in many cases the names and addresses of the purchasers of the music reflected in the metadata (including where a purchaser provided such personally-identifying information to the application developer as a prerequisite to installing the application or enrolling in services offered by the developer in its application, as is required of users of, for example, Pandora, Spotify, and innumerable other iOS mobile applications).

1  Accordingly, by engaging in these practices, Apple disclosed the Personal Listening

2  Information of its customers to various third-party mobile application developers.

3        58.    On January 13, 2016, an iOS application developer named Ben Dodson

4  found the foregoing capabilities of Apple's MediaPlayer Framework API so invasive

5  of privacy that he submitted a publicly-accessible "bug report" to Apple about it,

6  describing the issue as a "security" hole in which "[a]ll metadata can be pulled from

7  the [iTunes] library without the user knowing." *See* Ex. F. Dodson's bug report went

8  on to state as follows:

9
> In recent years, iOS has made a concerted push to being
> privacy focussed. However, one area this is not the case is
10
> with the MediaPlayer framework and in particular the
> MPMediaQuery.songsQuery() method. With that one line of
11
> code, you can get the full metadata for every song in a user's
> library without them ever knowing. This information could
12
> be sent back to a server silently and then used for various
> nefarious purposes such as:
13
14
> - Building up a profile of that user in order to produce
> targeted advertising
15
> - Using the information as a reliable way of tracking someone
> across multiple apps (as it can act as a unique identifier)
16
17
> In my opinion, access to the music library should be
> protected in much the same way as location, contacts,
18
> calendars, or photos are with a requirement from the
> developer to ask permission and for the user to be able to
19
> grant permission and subsequently revoke it via the standard
> iOS system preferences.
> …
20
> I make use of this feature in my app Music Tracker
> (https://dodoapps.io/music-tracker) but I'd feel much happier
21
> about it if the user was allowing me access to their library
> rather than it being automatic without their knowledge.
22

23  *Id*. Dobson noted that Apple's MediaPlayer Framework API enabled developers of

24  mobile applications to use the "MPMediaQuery.songsQuery()" function of the API to

CLASS ACTION COMPLAINT

instruct Apple to transmit the "full music library metadata" from "any iOS device" using "iOS 3.0 and above" on which the application had been installed. *See id.*

59. On January 22, 2016, Apple responded to Dobson's "bug report," stating in pertinent part:

> We are aware of this issue. It is being investigated. Thank you for taking the time to pass it along to us. For the protection of our customers, Apple does not publicly disclose, discuss or confirm security issues until a full investigation has occurred and any necessary patches or releases are available.

*Id.*

60. Apple nonetheless failed to take any corrective measure to address the issue until the public release of iOS 10.0, which occurred nearly eight months later on or about September 13, 2016, and even then Apple merely began informing users that their iTunes libraries may be "accessed" by developers of mobile applications utilizing the MediaPlayer Framework API or similar functionality built with the iOS SDK. Thus, the disclosures that Apple implemented in response to Dobson's bug report (in versions 10.0 and later of iOS) plainly fail to adequately put users on notice that their Personal Listening Information will be extracted from their iTunes libraries and disclosed by Apple to the developers of such applications. Accordingly, this disclosure language has at all times material hereto been incapable of manifesting anyone's informed written consent to Apple's practices of disclosing its customers' Personal Listening Information, even though the company was required to obtain such consent prior to disclosing its customers' Personal Listening Information pursuant to the MIPPPA and the RIVRPA.

61.     Still today, Apple permits application developers to use its APIs and other developers' functionality in the same or substantially the same way as described above, and thus still transfers to application developers the metadata containing its customers' Personal Listening Information on demand.

62.     For example, the current version of Apple's "Apple Music API," which is part of Apple's "MusicKit" framework and is presently used by developers in conjunction with the MediaPlayer Framework API, as discussed above, allows developers to access information about the particular media – such as albums, songs, artists, and playlists – that are located in a particular user's personal iCloud library. Apple describes the Apple Music API as providing developers the following functionality:

> The Apple Music API is a web service that lets you access information about the media found in the Apple Music Catalog and the user's personal iCloud Music Library. Here's what each one includes:
>
> - The Apple Music Catalog includes all resources available in Apple Music.
>
> - <u>The user's iCloud Music Library contains only those resources that the user added to their personal library. For example, it contains items from Apple Music, songs purchased from iTunes Store</u>, and imports from discs and other apps. This library may include content not found in the Apple Music Catalog.
>
> Use this service to retrieve information about albums, songs, artists, playlists, music videos, Apple Music stations, ratings, charts, recommendations, and the user's most recently played content. With proper authorization from the user, you can also create or modify playlists and apply ratings to the user's content.

*See* Apple Inc., *Apple Music API*, *available at* https://developer.apple.com/documentation/applemusicapi (last accessed May 24, 2019) (section titled "Overview") (emphasis added), a copy of which is attached hereto as **Exhibit H**.  Notably, the Apple Music API only requires "proper authorization from the user" in order for the developer to "create or modify playlists and apply ratings to the user's content."  Thus, developers using this API still have "read only" access to metadata reflecting the contents of users' iCloud Music Library (reflecting, inter alia, the specific titles of the music and other items purchased from Apple via its iTunes Store), via transmissions of such metadata by Apple to such developers on demand.

63.    Developers are also able to access identifying information associated with particular users, including via music user "tokens," which are capable of association with uniquely identifying information pertaining to individual users (including, for example, by the numerous application developers who store the names and addresses of their users collected during enrollment or otherwise). Requests to the Apple Music API are sent using HTTPS commands and are associated with particular developers' apps, by way of developer tokens that authenticate certain developers as "trusted developers" and members of the Apple Developer Program.  Thus, Plaintiffs are informed and believe, and thereupon allege, that Apple readily possesses information reflecting each of the instances in which it has disclosured its customers' Personal Listening Information, as well as data reflecting when and to whom such disclosures were made.

64.    Further, Apple has developed its own applications, web-based and otherwise, to facilitate the transmission of its own customers' Personal Listening

CLASS ACTION COMPLAINT

Information to other Apple customers. For example, during the relevant time period, Apple has transmitted or otherwise disclosed its customers' Personal Listening Information to other iTunes accountholders, including on information and belief entities engaged in the practices of collecting Personal Listening Information, in order to monetize Apple-developed platforms for its customers to "gift" songs from their iTunes playlists to other Apple customers, and to otherwise share content that its customers have purchased.[21]   Thus, during the relevant time period, when an iTunes user used Apple's functionality for "gifting" content to another user, including gifting a digitally-recorded song purchased on iTunes to another iTunes user, the gifter-user was presented a screen depicted, in pertinent part, as following:



To the extent a user to whom a particular song was being gifted had already purchased that song, Apple disclosed to the gifter that the giftee "has already purchased" that particular song, as shown in the following portion of a screenshot of such a disclosure:



---

[21]   *See*   A.   McAfee,   *SpyTunes*,   *available   at* http://andrewmcafee.org/2011/02/mcafee-apple-itunes-privacy-hole-violation/   (last accessed May 10, 2019) (attached hereto as **Exhibit I**); A. Howard, *Apple iTunes Gifts Users with a Privacy Hole*, Radar, *available at* http://radar.oreilly.com/2011/02/itunes-privacy-hole.html (last accessed May 11, 2019).

CLASS ACTION COMPLAINT

*See* Ex. G. By way of the foregoing tool, designed by Apple to further monetize content that had already been purchased by its customers, as well as through other similar publicly-accessible functionality provided by Apple, any person with an iTunes account or any other entity (including those engaged in the business of collecting and trafficking in Personal Listening Information) had the ability during at least a portion of the relevant time period to obtain the Personal Listening Information of particular Apple customers, via disclosures made to them by Apple. *See id.* ("This strikes me as problematic. A person's taste in media can be highly personal, yet all of Apple's more than 10 billion song and 200 million TV and movie downloads are potentially traceable by . . . the world's spies, stalkers, yellow journalists, and opposition researchers.").

65. Plaintiffs are informed and believe, and thereupon allege, that Apple has also sold, rented, transmitted, or otherwise disclosed its customers Personal Listening Information to third party data analytics companies, including without limitation Gracenote, Inc., The Nielsen Company, and MusicMetric.

66. As a result of Apple's data compiling and sharing practices, companies have obtained and continue to obtain the Personal Listening Information of Apple's customers, including those in Michigan and Rhode Island, together with additional sensitive personal information that has been appended thereto by data appenders and others (such as, for example, the income, gender, marital status, education, and family composition (including the presence of children) of Apple's customers).

67. Plaintiffs are informed and believe, and thereupon allege, that numerous mobile application developers and other third parties to whom Apple has transmitted and/or otherwise disclosed its customers' Personal Listening Information (including

via its MediaPlayer, Apple Music and MusicKit APIs), either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, and otherwise disclosed that Personal Listening Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

68.    Apple's disclosures of Personal Listening Information have put its customers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, as a result of Apple's disclosures of Personal Listening Information, any person or entity could rent a list with the names and addresses of all unmarried, college-educated women over the age of 70 with a household income of over $80,000 who have purchased country music from Apple using the iTunes Store application that came pre-installed on their iPhones. Such a list is available for sale for approximately $136 per thousand customers listed.

69.    Apple does not seek its customers' prior written consent to the disclosure of their Personal Listening Information and its customers remain unaware that their Personal Listening Information and other sensitive data is being sold, rented and exchanged on the open market.

70.    By disclosing the nature and titles of its customers' music purchases, music-listening preferences, and personally-identifying information – which can collectively "reveal intimate facts about our lives"[22] – Apple has intentionally disclosed

---

[22]    California's Reader Privacy Act Signed into Law, EFF (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 14, 2019).

CLASS ACTION COMPLAINT

to third parties its customers' Personal Listening Information, without their consent, in direct violation of Michigan's MIPPPA and Rhode Island's RIVRPA.

## PLAINTIFFS' EXPERIENCES

### I.   Plaintiff Leigh Wheaton

71.     Plaintiff Wheaton has on numerous occasions over the past three years, while residing in Rhode Island, used an iPhone to purchase digital music, including rock music, directly from Apple via its iTunes Store.

72.     Prior to and at the time she purchased digital music, including rock music, from Apple via its iTunes Store, Apple did not notify Plaintiff Wheaton that it would disclose the Personal Listening Information of its customers to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, and Plaintiff Wheaton has never authorized Apple to do so. Furthermore, Plaintiff Wheaton was never provided any written notice that Apple licenses, rents, exchanges, or otherwise discloses its customers' Personal Listening Information to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, or any means of opting out of such disclosures of her Personal Listening Information.

73.     Apple nonetheless sold, rented, transmitted and/or otherwise disclosed Plaintiff Wheaton's Personal Listening Information, either directly or through an intermediary or intermediaries, to numerous third parties, including data miners,

1   appenders, aggregators, and analytics companies; mobile application developers; and

2   other third parties during the relevant time period.

3       74.    Plaintiff Wheaton is informed and believes, and thereupon alleges, that

4   multiple mobile application developers and/or other third parties to whom Apple has

5   transmitted and/or otherwise disclosed her Personal Listening Information have in turn

6   sold, rented, transmitted, and otherwise disclosed her Personal Listening Information

7   (together with other sensitive personal demographic and lifestyle information appended

8   thereto by data appenders and other entities) to other third parties, including other data

9   brokers, data miners, data appenders, and marketing companies.

10      75.    Because Apple sold, rented, transmitted and/or otherwise disclosed

11  Plaintiff Wheaton's Personal Listening Information, Plaintiff Wheaton now receives

12  junk mail from various companies and other organizations that do not offer products

13  or services through the mail. These unwarranted mailings waste Plaintiff Wheaton's

14  time, money, and resources. These unwarranted and harassing junk mailings, which are

15  attributable to Apple's unauthorized sale, rental, and/or other disclosure of her Personal

16  Listening Information, have wasted Plaintiff Wheaton's time, money, and resources.

17      76.    Because Plaintiff Wheaton is entitled by law to privacy in her Personal

18  Listening Information, and paid money for the music she purchased and downloaded

19  from Apple via its iTunes Store, Apple's disclosure of her Personal Listening

20  Information deprived Plaintiff Wheaton of the full set of benefits to which she was

21  entitled as a part of her digital music purchases, thereby causing her economic harm.

22  Accordingly, what Plaintiff Wheaton received (digital music purchases without

23  statutory privacy protections) was less valuable than what she paid for (digital music

24

purchases with statutory privacy protections), and she would not have been willing to pay as much, if at all, for the music she purchased from Apple via its iTunes Store had she known that Apple would disclose her Personal Listening Information.

## II.   Plaintiff Jill Paul

77.     Plaintiff Jill Paul has on numerous occasions over the past three years, while residing in Michigan, used an iPhone to purchase digital music, including rock music, directly from Apple via its iTunes Store.

78.     Prior to and at the time she purchased digital music, including rock music, from Apple via its iTunes Store, Apple did not notify Plaintiff Jill Paul that it would disclose the Personal Listening Information of its customers to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, and Plaintiff Jill Paul has never authorized Apple to do so. Furthermore, Plaintiff Jill Paul was never provided any written notice that Apple licenses, rents, exchanges, or otherwise discloses its customers' Personal Listening Information to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, or any means of opting out of such disclosures of her Personal Listening Information.

79.     Apple nonetheless sold, rented, transmitted and/or otherwise disclosed Plaintiff Jill Paul's Personal Listening Information, either directly or through an intermediary or intermediaries, to numerous third parties, including data miners,

appenders, aggregators, and analytics companies; mobile application developers; and other third parties during the relevant time period.

80.     Plaintiff Jill Paul is informed and believes, and thereupon alleges, that multiple mobile application developers and/or other third parties to whom Apple has transmited and/or otherwise disclosed her Personal Listening Information have in turn sold, rented, transmitted, and otherwise disclosed her Personal Listening Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

81.     Because Apple sold, rented, transmitted and/or otherwise disclosed Plaintiff Jill Paul's Personal Listening Information, Plaintiff Jill Paul now receives junk mail from various companies and other organizations that do not offer products or services through the mail. These unwarranted and harassing junk mailings, which are attributable to Apple's unauthorized sale, rental, and/or other disclosure of her Personal Listening Information, have wasted Plaintiff Jill Paul's time, money, and resources.

82.     Because Plaintiff Jill Paul is entitled by law to privacy in her Personal Listening Information, and paid money for the music she purchased and downloaded from Apple via its iTunes Store, Apple's disclosure of her Personal Listening Information deprived Plaintiff Jill Paul of the full set of benefits to which she was entitled as a part of her digital music purchases, thereby causing her economic harm. Accordingly, what Plaintiff Jill Paul received (digital music purchases without statutory privacy protections) was less valuable than what she paid for (digital music purchases with statutory privacy protections), and she would not have been willing to

CLASS ACTION COMPLAINT

pay as much, if at all, for the music she purchased from Apple via its iTunes Store had she known that Apple would disclose her Personal Listening Information.

### III.    Plaintiff Trevor Paul

83.    Plaintiff Trevor Paul has on numerous occasions over the past three years, while residing in Michigan, used an iPhone to purchase digital music, including rock music, directly from Apple via its iTunes Store.

84.    Prior to and at the time he purchased digital music, including rock music, from Apple via its iTunes Store, Apple did not notify Plaintiff Trevor Paul that it would disclose the Personal Listening Information of its customers to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, and Plaintiff Trevor Paul has never authorized Apple to do so. Furthermore, Plaintiff Trevor Paul was never provided any written notice that Apple licenses, rents, exchanges, or otherwise discloses its customers' Personal Listening Information to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, or any means of opting out of such disclosures of his Personal Listening Information.

85.    Apple nonetheless sold, rented, transmitted and/or otherwise disclosed Plaintiff Trevor Paul's Personal Listening Information, either directly or through an intermediary or intermediaries, to numerous third parties, including data miners, appenders, aggregators, and analytics companies; mobile application developers; and other third parties during the relevant time period.

86.     Plaintiff Trevor Paul is informed and believes, and thereupon alleges, that multiple mobile application developers and/or other third parties to whom Apple has transmited and/or otherwise disclosed his Personal Listening Information have in turn sold, rented, transmitted, and otherwise disclosed his Personal Listening Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

87.     Because Apple sold, rented, transmitted and/or otherwise disclosed Plaintiff Trevor Paul's Personal Listening Information, Plaintiff Trevor Paul now receives junk mail from various companies and other organizations that do not offer products or services through the mail. These unwarranted and harassing junk mailings, which are attributable to Apple's unauthorized sale, rental, and/or other disclosure of his Personal Listening Information, have wasted Plaintiff Trevor Paul's time, money, and resources.

88.     Because Plaintiff Trevor Paul is entitled by law to privacy in his Personal Listening Information, and paid money for the music he purchased and downloaded from Apple via its iTunes Store, Apple's disclosure of his Personal Listening Information deprived Plaintiff Trevor Paul of the full set of benefits to which he was entitled as a part of his digital music purchases, thereby causing him economic harm. Accordingly, what Plaintiff Trevor Paul received (digital music purchases without statutory privacy protections) was less valuable than what he paid for (digital music purchases with statutory privacy protections), and he would not have been willing to

pay as much, if at all, for the music he purchased from Apple via its iTunes Store had he known that Apple would disclose his Personal Listening Information.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff Wheaton brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of herself and a class of similarly-situated Rhode Island residents (the "RI Class"), defined as follows:

> All residents of Rhode Island who, at any time during the applicable statutory period, had their Personal Listening Information disclosed to third parties by Apple without their consent.

90.     Plaintiffs Jill Paul and Trevor Paul bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and a class of similarly-situated Michigan residents (the "MI Class"), defined as follows:

> All residents of Michigan who, at any time between May 24, 2016 and July 30, 2016, had their Personal Listening Information disclosed to third parties by Apple without their consent.

91.     The RI Class and the MI Class are referred to herein collectively at times as the "Classes".

92.     Excluded from the Classes is any entity in which Apple has a controlling interest, and officers or directors of Apple.

93.     Members of the Classes are so numerous that their individual joinder herein is impracticable, as they number, on information and belief, in the tens of thousands for the RI Class and the hundreds of thousands for the MI Class. The precise number of members of the Classes and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Members of the Classes may be

notified of the pendency of this action by mail and/or publication through the distribution records of Apple.

94.     Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. Common legal and factual questions include, but are not limited to:

(a)     For the RI Class: (1) whether Apple is a "retailer or distributor" of music products; (2) whether Apple disclosed the "nature" of the music purchased by Plaintiff Wheaton and the RI Class; (3) whether Apple obtained the requisite consent before disclosing to third parties Plaintiff Wheaton's and the RI Class's Personal Listening Information; (4) whether Apple's disclosure of Plaintiff Wheaton' and the RI Class's Personal Listening Information violated Rhode Island General Laws § 11-18-32; and (5) whether Apple's sale, rental, transmission, and/or disclosure of Plaintiff Wheaton's and the RI Class's Personal Listening Information constitutes unjust enrichment.

(b)     For the MI Class: (1) whether Apple is "engaged in the business of selling at retail" digitally-recorded and downloadable "sound recordings"; (2) whether Apple obtained the requisite consent before disclosing to third parties Plaintiffs' and the MI Class's Personal Listening Information; (3) whether Apple's disclosure of Plaintiffs' and the MI Class's Personal Listening Information violated the MIPPPA § 2; and (4) whether Apple's sale, rental, transmission, and/or disclosure of Plaintiffs' and the MI Class's Personal Listening Information constitutes unjust enrichment.

95.     The claims of the named Plaintiffs are typical of the claims of each of the Classes in that the Classes and the named Plaintiffs sustained damages as a result of

35

Apple's uniform wrongful conduct, based upon Apple's disclosures of Plaintiffs' and the Classes' Personal Listening Information.

96.     Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

97.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes. Each individual member of each of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Apple's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Apple's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

CLASS ACTION COMPLAINT

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE RIVRPA (R.I. Gen. Laws § 11-18-32)**
**(By Plaintiff Wheaton on Behalf of Herself and the RI Class Against Apple)**

98.   Plaintiff Wheaton repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

99.   Plaintiff Wheaton brings this claim on behalf of herself and the members of the RI Class against Defendant Apple.

100.   Through its iTunes Store mobile application, Apple sells and rents digitally-recorded music products to consumers at retail and distributes those products to consumers. *See* R.I. Gen. Laws § 11-18-32(a).

101.   The digitally-recorded music that Plaintiff Wheaton purchased from Apple via its iTunes Store are published materials that are "like" "records" and/or "cassettes" within the meaning of R.I. Gen. Laws § 11-18-32(a).

102.   By purchasing digitally-recorded music from Apple via its iTunes Store platform, Plaintiff Wheaton purchased materials that are "like" "records" and/or "cassettes," from a "retailer or distributor of those products" within the meaning of R.I. Gen. Laws § 11-18-32(a). *See* R.I. Gen. Laws § 11-18-32(a).

103.   At all times relevant, and beginning on the dates that Plaintiff Wheaton first purchased music from Apple via the iTunes Store, Apple disclosed to third persons Plaintiff Wheaton's Personal Listening Information — which identified her address and identified her as a purchaser of music of the rock genre, as well as a purchaser of particular titles of music — in at least two ways.

CLASS ACTION COMPLAINT

104. First, Apple disclosed mailing lists containing Plaintiff Wheaton's Personal Listening Information, including the genres of music she has purchased, to data aggregators, data appenders, marketing companies, mobile application developers, and other third parties, who then supplemented the mailing lists with additional sensitive information from their own databases and re-disclosed the lists to other third parties for profit.

105. Second, Apple disclosed the Personal Listening Information of Plaintiff Wheaton, including the genres and titles of music she has purchased, to numerous iOS mobile application developers and other third parties, who have in turn disclosed such data to other third parties for profit.

106. Additionally, Plaintiff Wheaton is informed and believes, and thereupon alleges, that Apple has also sold, rented, transmitted, or otherwise disclosed her Personal Listening Information and that of the other members of the RI Class to third party data analytics companies, without their consent, including without limitation to Gracenote, Inc., The Nielsen Company, and MusicMetric.

107. At all times relevant, and beginning on the dates that Plaintiff Wheaton first purchased music from Apple via the iTunes Store, various third parties have, upon receiving the Personal Listening Information of Plaintiff Wheaton and the other members of the RI Class from Apple, further re-disclosed Plaintiff Wheaton's and the RI Class's Personal Listening Information to other third persons, including data aggregators, data appenders, marketing companies, mobile application developers, and other third parties.

108.   Because the mailing lists disclosed by Apple and redisclosed by other downstream entities included additional information from the data aggregators and appenders, the lists were more valuable, and Apple and the other third-party traffickers of such data were able to increase their profits gained from the mailing list rentals and/or exchanges.

109.   By selling, renting, transmitting, and/or otherwise disclosing its customer lists, together with its customers' addresses and the genres and/or titles of the music they puchased, Apple disclosed to persons other than Plaintiff Wheaton records which would identify her name, address, and the "nature" of the music she purchased from Apple. *See* R.I. Gen. Laws § 11-18-32(a).

110.   Plaintiff Wheaton and the members of the RI Class never consented to Apple disclosing their Personal Listening Information to anyone.

111.   Worse yet, Plaintiff Wheaton and the members of the RI Class did not receive notice before Apple disclosed their Personal Listening Information to third parties.

112.   Apple's disclosures of Plaintiff Wheaton's and the RI Class's Personal Listening Information were not made pursuant to lawful compulsion.

113.   Apple's disclosures of Plaintiff Wheaton's and the RI Class's Personal Listening Information were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, marketers, mobile application developers, and other third parties, in order to increase Apple's revenue.

114.   By disclosing Plaintiff Wheaton's and the RI Class's Personal Listening Information, Apple violated Plaintiff's and the RI Class's statutorily-protected right to privacy in their music-listening habits. *See* R.I. Gen. Laws § 11-18-32(a).

115.   Additionally, because Plaintiff Wheaton and the members of the RI Class paid Apple for the music they purchased from Apple's iTunes Store platform, and because Apple was obligated to comply with the RIVRPA, Apple's unlawful disclosure of Plaintiff Wheaton's and the other RI Class members' Personal Listening Information deprived Plaintiff Wheaton and the RI Class members of the full value of their paid-for digitally-recorded music. Because Plaintiff Wheaton and the other RI Class members ascribe monetary value to the privacy of their Personal Listening Information, Apple's unlawful sales, rentals, transmissions, and/or other disclosures of their Personal Listening Information caused them to receive less value than they paid for, thereby causing them economic harm.

116.   Likewise, because Plaintiff Wheaton and the other RI Class members ascribe monetary value to the privacy of their Personal Listening Information, a purchase of digitally-recorded that includes privacy protections for their Personal Listening Information is more valuable than one that does not.

117.   Accordingly, had Plaintiff Wheaton been adequately informed of Apple's disclosure practices, she would not have been willing to purchase the digitally-recorded music that she bought from Apple via its iTunes Store at the prices charged, if at all. Thus, Apple's unlawful disclosures caused Plaintiff Wheaton economic harm.

CLASS ACTION COMPLAINT

118. Apple's disclosures of Plaintiff Wheaton's Personal Listening Information to third parties has also caused an influx of third party print advertisements and e-mail spam to Plaintiff Wheaton's postal mailbox and e-mail inbox.

119. As a result of Apple's unlawful disclosures of their Personal Listening Information, Plaintiff Wheaton and the members of the RI Class have suffered privacy and economic injuries. On behalf of herself and the RI Class, Plaintiff Wheaton seeks: (1) an injunction requiring Apple to obtain consent from Rhode Island customers prior to disclosing their Personal Listening Information as required by the RIVRPA; (2) $250.00 for each RI Class member for each violation committed by Apple pursuant to R.I. Gen. Laws § 11-18-32(d); and (3) costs and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE MIPPPA**
**(H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988)**
**(By the MI Plaintiffs on Behalf of Themselves and the MI Class Against Apple)**

120. Plaintiffs Jill Paul and Trevor Paul (hereinafter the "MI Plaintiffs") repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

121. The MI Plaintiffs bring this claim on behalf of themselves and the members of the MI Class against Apple.

122. The digitally-recorded music that Apple sells via its iTunes Store application constitute "sound recordings" within the meaning of MIPPPA § 2.

123. Through its iTunes Store mobile application, Apple is engaged in the business of selling and renting digitally-recorded music products to consumers at retail.

124. By purchasing and/or renting digitally-recorded rock music via the iTunes Store platform, each of the MI Plaintiffs purchased "sound recordings" directly from Apple. *See id.*

125. Because the MI Plaintiffs purchased sound recordings directly from Apple, the MI Plaintiffs are "customers" within the meaning of the MIPPPA. *See* MIPPPA § 1(a).

126. At various times between May 24, 2016 and July 30, 2016, Apple disclosed to third persons the MI Plaintiffs' Personal Listening Information, which identified them as purchasers of particular genres of music and of particular titles of music, in at least two ways.

127. First, between May 24, 2016 and July 30, 2016, Apple disclosed mailing lists containing the MI Plaintiffs' Personal Listening Information, including the genres of music they have purchased, to data aggregators, data appenders, marketing companies, mobile application developers, and other third parties, who then supplemented the mailing lists with additional sensitive information from their own databases and re-disclosed the lists to other third parties for profit.

128. Second, between May 24, 2016 and July 30, 2016, Apple disclosed the Personal Listening Information of the MI Plaintiffs, including the genres and titles of music they have purchased, to numerous third-party iOS mobile application developers and other third parties, who have in turn disclosed such data to other third parties for profit.

129. Additionally, the MI Plaintiffs are informed and believe, and thereupon allege, that Apple has also sold, rented, transmitted, or otherwise disclosed their

CLASS ACTION COMPLAINT

1    Personal Listening Information and that of the other members of the MI Class to third

2    party data analytics companies, without their consent, including without limitation  to

3    Gracenote, Inc., The Nielsen Company, and MusicMetric.

4         130.   By selling, renting, transmitting, and/or otherwise disclosing its customer

5    lists together with the genres and/or titles of the music purchased by its customers

6    between May 24, 2016 and July 30, 2016, Apple disclosed to persons other than the

7    MI Plaintiffs records or information concerning the MI Plaintiffs' purchases of

8    digitally-recorded music, i.e., "sound recordings," from Apple. *See* R.I. Gen. Laws §

9    11-18-32(a).

10        131.   The information Apple disclosed indicates the MI Plaintiffs' names and

11   addresses, as well as information indicating that they had purchased particular genres

12   and titles of music from Apple.  Accordingly, the records or information disclosed by

13   Apple indicated the MI Plaintiffs' identities. *See* MIPPPA § 2.

14        132.   The MI Plaintiffs and the members of the MI Class never consented to

15   Apple disclosing their Personal Listening Information to anyone.

16        133.   The MI Plaintiffs and the members of the MI Class did not receive notice

17   before Apple disclosed their Personal Listening Information to third parties.

18        134.   Apple's disclosures of the MI Plaintiffs' and the MI Class's Personal

19   Listening Information between May 24, 2016 and July 30, 2016 were not made

20   pursuant to a court order, search warrant, or grand jury subpoena.

21        135.   Apple's disclosures of the MI Plaintiffs' and the MI Class's Personal

22   Listening Information between May 24, 2016 and July 30, 2016 were not made to

23   collect payment for their music purchases.

24

136.   Apple's disclosures of the MI Plaintiffs' Personal Listening Information between May 24, 2016 and July 30, 2016 were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, marketers, mobile application developers, and other third parties, in order to increase Apple's revenue.  Accordingly, Apple's disclosures were not made for the exclusive purpose of marketing goods and services directly to the MI Plaintiffs and the members of the MI Class.

137.   By disclosing the MI Plaintiffs' Personal Listening Information between May 24, 2016 and July 30, 2016, Apple violated Plaintiff's and the Class's statutorily-protected right to privacy in their music-listening habits. *See* MIPPPA § 2.

138.   Additionally, because the MI Plaintiffs and the members of the MI Class paid Apple for the music they purchased from Apple's iTunes Store platform, and because Apple was obligated to comply with the MIPPPA, Apple's unlawful disclosure of the MI Plaintiffs' and the other MI Class members' Personal Listening Information deprived Plaintiffs and the RI Class members of the full value of their paid-for digitally-recorded music. Because the MI Plaintiffs and the other MI Class members ascribe monetary value to the privacy of their Personal Listening Information, Apple's unlawful sales, rentals, transmissions, and/or other disclosures of their Personal Listening Information caused them to receive less value than they paid for, thereby causing them economic harm.

139.   Likewise, because the MI Plaintiffs and the other MI Class members ascribe monetary value to the privacy of their Personal Listening Information, a

purchase of digitally-recorded that includes privacy protections for their Personal Listening Information is more valuable than one that does not.

140. Accordingly, had the MI Plaintiffs been adequately informed of Apple's disclosure practices, they would not have been willing to purchase the digitally-recorded music that they bought from Apple via its iTunes Store at the prices charged, if at all. Thus, Apple's unlawful disclosures caused the MI Plaintiffs economic harm.

141. Apple's disclosure of the MI Plaintiffs' Personal Listening Information to third parties between May 24, 2016 and July 30, 2016 has also caused an influx of third party print advertisements and e-mail spam to the MI Plaintiffs' mailboxes and inboxes.

142. As a result of Apple's unlawful disclosures of their Personal Listening Information, the MI Plaintiffs and the members of the MI Class have suffered privacy and economic injuries. On behalf of themselves and the MI Class, the MI Plaintiffs seek: (1) an injunction requiring Apple to obtain consent from Michigan customers prior to disclosing their Personal Listening Information as required by the MIPPPA; (2) $5,000.00 for each MI Class member for each violation committed by Apple pursuant to MIPPPA § 5(a); and (3) costs and reasonable attorneys' fees pursuant to MIPPPA § 5(b).

### THIRD CLAIM FOR RELIEF
#### UNJUST ENRICHMENT
**(Brought by all Plaintiffs on Behalf of Themselves
And Members of Both Classes Against Apple)**

143. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

144. Plaintiffs all bring this claim individually and on behalf of the members of both Classes against Apple.

145.   Plaintiffs and the members of the Classes conferred benefits on Apple by providing Apple with their Personal Listening Information and paying Apple for the digitally-recorded music they purchased from Apple via its iTunes Store platform.

146.   Apple received and retained the information and money belonging to Plaintiffs and the Classes when Plaintiffs and the members of the Classes purchased digitally-recorded music from Apple via its iTunes Store platform.

147.   Because Apple received and processed payments for music purchases from Plaintiffs and the members of the Classes, together with their Personal Listening Information, and because Apple has employees and/or agents handling customer accounts and billing as well as customer data, Apple appreciates or has knowledge of such benefits.

148.   Under the MIPPPA and RIVRPA, Plaintiffs and the members of the Classes were entitled to confidentiality in their Personal Listening Information as part of their purchases.

149.   Under principles of equity and good conscience, because Apple failed to comply with the MIPPPA and RIVRPA, Apple should not be allowed to retain the full amount of money Plaintiffs and the members of the Classes paid for their purchases or the money it received by selling, renting, transmitting, and/or otherwise disclosing the Personal Listening Information of Plaintiffs and the members of the Classes.

150.   Plaintiffs and the members of the Classes have suffered actual damages as a result of Apple's unlawful conduct in the form of the value Plaintiffs and the members of the Classes paid for and ascribed to the confidentiality of their Personal Listening Information. This amount is tangible and will be calculated at trial.

CLASS ACTION COMPLAINT

151.   Additionally, Plaintiffs and the members of the Classes have suffered actual damages inasmuch as Apple's failure to inform them that it would disclose their Personal Listening Information caused them to purchase digitally-recorded music via the iTunes Store when they otherwise would not have.

152.   Further, a portion of the purchase price of each song or album of music sold to Plaintiffs and the members of the Classes was intended to ensure the confidentiality of their Personal Listening Information, as required by the MIPPPA and the RIVRPA. Because Plaintiffs and the members of the Classes were denied services that they paid for and were entitled to receive—i.e., confidentiality in their Personal Listening Information—and because Plaintiffs and the members of the Classes would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

153.   To prevent inequity, Apple should return to Plaintiffs and the members of the Classes: (1) the value they ascribe to maintaining the confidentiality of their Personal Listening Information, and (2) all money derived from Apple's sales, rentals, transmissions, and/or other disclosures of the Personal Listening Information of Plaintiffs and the members of the Classes.

154.   Accordingly, Plaintiffs and the members of the Classes seek an order declaring that Apple's conduct constitutes unjust enrichment, and awarding Plaintiffs and the members of the Classes restitution in an amount to be calculated at trial equal to the amount of money obtained by Apple through its sales, rentals, transmissions, and/or other disclosures of the Personal Listening Information of Plaintiffs and the members of the Classes.

CLASS ACTION COMPLAINT

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiffs seek a judgment against Apple, individually and on

3 behalf of all others similarly situated, as follows:

4      A.     For an order certifying the Classes under Rule 23 of the Federal Rules of

5 Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiffs'

6 attorneys as Class Counsel to represent the Classes.

7      B.     For an order declaring that Apple's conduct as described herein violates

8 the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32;

9      C.     For an order declaring that Apple's conduct as described herein violates

10 Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg., Reg. Sess.,

11 P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess.,

12 P.A. No. 206, § 1 (Mich. 1989);

13      D.     For an order finding in favor of Plaintiffs and the Classes on all counts

14 asserted herein;

15      E.     For Apple to pay $250 to Plaintiff Wheaton and each unnamed RI Class

16 member, as provided by the Video, Audio, And Publication Rentals Privacy Act, R.I.

17 Gen. Laws § 11-18-32(d);

18      F.     For Apple to pay $5,000 to Plaintiffs Jill Paul and Trevor Paul and each

19 MI Class member, as provided by the Preservation of Personal Privacy Act, H.B. 5331,

20 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694,

21 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989);

22      G.     For prejudgment interest on all amounts awarded;

23      H.     For an order of restitution and all other forms of equitable monetary relief;

24

CLASS ACTION COMPLAINT

1      I.      For injunctive relief as pleaded or as the Court may deem proper; and

2      J.      For an order awarding Plaintiffs and the Classes their reasonable

3 attorneys' fees and expenses and costs of suit.

4 <center>**DEMAND FOR JURY TRIAL**</center>

5      Plaintiffs, on behalf of themselves and the Classes, hereby demand a trial by jury

6 pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

7 Dated:  May 24, 2019          Respectfully submitted,

8            By: <u>/s/ Frank S. Hedin</u>
                  Frank S. Hedin
9

10           FRANK S. HEDIN (SBN 291289)
           fhedin@hedinhall.com
           DAVID W. HALL (SBN 274921)
11           dhall@hedinhall.com
           **HEDIN HALL LLP**
12           Four Embarcadero Center, Suite 1400
           San Francisco, California 94104
13           Telephone:  (415) 766-3534
           Facsimile:   (415) 402-0058
14

15           TINA WOLFSON (SBN 174806)
           twolfson@ahdootwolfson.com
           ROBERT AHDOOT (SBN 172098)
16           rahdoot@ahdootwolfson.com
           **AHDOOT & WOLFSON, PC**
17           10728 Lindbrook Dr.
           Los Angeles, California 90024
18           Telephone:  (310) 474-9111
           Facsimile:   (310) 474-8585
19

20           L. TIMOTHY FISHER (SBN 191626)
           ltfisher@bursor.com
           **BURSOR & FISHER, P.A.**
21           1990 North California Blvd., Suite 940
           Walnut Creek, California 94596
22           Telephone:  (925) 300-4455
           Facsimile:   (925) 407-2700
23

24

<center>49</center>
<center>CLASS ACTION COMPLAINT</center>

JOSEPH I. MARCHESE*
jmarchese@bursor.com
PHILIP L. FRAIETTA*
pfraietta@bursor.com
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163

* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiffs and the Putative Classes*

CLASS ACTION COMPLAINT